[Civ. No. 13791. Second Dist., Div. Two. Dec. 18, 1942.]

THE PEOPLE, Appellant, v. ONE 1939 BUICK COUPE, ENGINE NO. 43788573, Defendant; HOLLYWOOD STATE BANK (a State Banking Corporation), Respondent.

Earl Warren, Attorney General, and Bayard Rhone, Deputy Attorney General, for Appellant.

Walter G. Danielson for Respondent.

MOORE, P. J.—One 1939 Buick coupé, having been seized by a law enforcing agency under the belief that it was being used to transport marihuana in violation of section 11610 of the Health and Safety Code, it was adjudged, following a

trial, that the interest of the registered owner be forfeited to the State but that the lien held by defendant bank was valid. The Department of Finance was directed to sell the car and to satisfy the lien of the bank. From such judgment the plaintiff has appealed.

 The sole question for determination is whether there is substantial, evidential support for the finding that the loan was not made on the automobile without first making a reasonable investigation of the moral responsibility, character and reputation of the borrower prior to making such a loan.

Some days prior to August 18, 1941, one Billie Berg was proprietor of the Cafe Capri in Los Angeles. On that day he called at the office of respondent bank and stated to the president, Mr. C. A. Adams, that one of his employees, to wit, Theodore Bunn, desired to procure an automobile loan on a 1939 Buick coupé. Upon Adams' inquiry as to the character of Bunn, Berg stated that he was a negro and the leader of the orchestra at the Capri; that he was a man of good moral character; that he desires to have the bank make the loan; and, finally, he said, "to show you how I feel about him, I will endorse the note." In further proof of Bunn's moral responsibility Berg stated that Bunn's income was not confined to his salary as orchestra leader but that the musician had an income from recordings and radio. Thereupon the president stated, "If you are willing to endorse his note, I will let him have the money." A few days following the conference between Berg and Adams, Bunn called at the bank and signed a note for $664.94 and a chattel mortgage on the Buick. At that time Bunn left an application form showing that he was an orchestra leader then serving his third week at the Capri. It gave the name of a former employer without his address, and two other personal references. At that time he stated that he had not then, and never had, any judgments against him. The application played no part in the original loan for the reason that the commitment had been made by the president before the application was filed. Neither does it appear that the former employer or any reference named in the application was ever interviewed relative to Bunn's character. However, such facts are recorded here in view of the subsequent renewal of the loan in January, 1942, at which time a new note and a new mortgage were executed solely for the purpose of reducing the amount of the monthly

payments. Thereafter on the third of February, the narcotic officers arrested Bunn riding in the Buick coupé while in possession of four marihuana cigarettes. At the time of its seizure the value of the coupé was appraised at $650 while the unpaid balance of the bank's note was $424.78.

In the ordinary loan transaction the financial responsibility of the borrower is the primary concern. However, in taking a mortgage upon an automobile which in itself may convey a cargo detrimental to the public, 'the problem becomes of vital interest to the state. The anti-narcotic law authorizes the forfeiture of a vehicle used to transport any narcotic. (§ 11610, Health and Safety Code.) Where a party has a lien upon such car seized by the authorities and makes claim to his interest he may succeed in enforcing his claim only in the event that he proves his lien or mortgage bona fide "and that his right, title, or interest was created after a reasonable investigation of the moral responsibility, character, and reputation" of the mortgagor and "without any knowledge that the vehicle was being, or was to be, used for the purpose charged." (§ 11620, ibid.) If the lender fails to make such reasonable investigation he must sacrifice his lien should the mortgaged car be forfeited for a violation of the law.

It follows that if the statements made by Berg be adjudged to be such as to satisfy a reasonably prudent person of Bunn's good moral character, the finding must be sustained. On the contrary if Berg's report was such as would not convince a reasonably prudent man of Bunn's moral character, the judgment should be reversed.

In evaluating the statements made by Berg to the bank two factors must be considered, viz., (1) the significance of the exact words used by Berg and (2) the moral and intellectual qualities of Berg as justifying a reliance upon his appraisal of an applicant for such loan.

We have already noted the language used by Berg at the time he requested the bank's president to finance the chattel mortgage. As to the dependability of Berg the record discloses that he had been a patron of the bank for more than six years. He had not only deposited the moneys from his cafe but had on divers occasions borrowed sums in excess of $10,000 and had pledged first class, listed securities as assurance of the payment of his obligations. Not a word is found in the record to question the presumed good character

of Mr. Berg. His relations with the bank had been cordial and nothing had occurred that might cause him to be suspected of being incapable of judging the character of his own employees.

While much emphasis is given to the fact of Adams' reliance upon Berg's statements to him yet it must be observed by the courts that their concern is whether the knowledge imparted by those who certify to the character of a borrower would under the circumstances warrant a reasonably prudent person to believe the applicant possessed of the requisite moral attributes. The combined circumstances in this case impel us to the conclusion that the court was not arbitrary in finding in favor of the bank. Adams' knowledge of Berg's success in business; Berg's active dealings as depositor and borrower; his promptness in discharging his obligations; his possession of class-A securities and life insurance policies— all might reasonably and readily give the judgment of Mr. Berg a value such as would leave no doubt of the reliability of his estimate of the colored boy's moral responsibility. Moreover, he was doubly reassured when Berg proved his own good faith by offering to guarantee the payment of the note.

Therefore, in view of the character of Mr. Berg, and the absence of any reason why he should deceive the bank it does not appear that the bank acted with undue haste or that it was otherwise negligent in its investigation of the character of the mortgagor of the automobile. The commendation of Bunn as one of "good moral character," and as one who worked daily at his vocation meets the requirement of the quoted statute. The fact that the entire story was told by Berg directly to the bank official, at the bank, does not detract from its value. Such a report upon the character of the applicant for the loan has the same office as a report gained from Berg at his cafe by a professional investigator for the bank would have had. Finally, the good moral character of Bunn was emphasized to Adams by the zeal with which the employer offered to endorse the note of his orchestra leader. Such offer was, in the judgment of the banker, reasonably considered evidence of Berg's good faith in making his commendation.

A statute imposing a forfeiture of an automobile by reason of its illegal use in transporting narcotics must be strictly

construed. Also, its construction must be according to the
sense as favorable to the owner of the automobile as is con-
sistent with fair principles of interpretation. (25 C.J.,
p. 1172.) The statute here involved does not prescribe either
a maximum or a minimum of investigation to be made by a
lender. Neither does it prescribe how or to what extent the
moral responsibility, character and reputation of a purchaser
shall be investigated. Its only requirements are that the
proposed mortgagee of an automobile establish his lien to be
bona fide; that it was created after a reasonable investiga-
tion of the moral responsibility, character, and reputation
of the mortgagor; and that it was without any knowledge
that the vehicle was being, or was to be, used for the purpose
charged. (*People* v. *One 1939 Plymouth 6 Coupé*, 41 Cal.App.
2d 559, 562 [107 P.2d 266].) In the absence of any more defi-
nite or extensive requirements for such investigation the action
of such lender must be governed by a reasonable considera-
tion of the facts of each case. When such consideration has
been exercised according to the circumstances it is not proper
for the reviewing courts to interfere with the judgment ''if
the record discloses any substantial evidentiary support
therefor.'' (*People* v. *One 1939 Plymouth 6 Coupé, supra;
Crawford* v. *Southern Pacific Co.*, 3 Cal.2d, 427, 429 [45 P.2d
183].)

In the case of *People* v. *One Plymouth Sedan*, 21 Cal.
App.2d 715 [69 P.2d 1011], after an employee had applied
for a loan to finance the purchase of an automobile the em-
ployer was sought out and he advised that the borrower
''was all right.'' While it is true that a credit report was
also obtained from a credit association at that time, it does
not appear from anything said in that decision or other-
wise that the finding of the trial court as to the sufficiency of
the investigation would not have been supported by the state-
ment of the employer that the employee was ''all right.''
 The substantial character of Mr. Berg as established by his
continued dealings with the bank and his enthusiastic report on
the colored boy were such evidence as will support a finding
that a reasonably prudent man may be thereby convinced
of the borrower's moral responsibility.

Appellant relies on *People* v. *One 1937 Packard 6 Touring
Sedan*, 50 Cal.App.2d 761 [123 P.2d 900]. While that de-
cision clearly indicates the principles by which the trial court

is to be guided in the consideration of causes instituted under the narcotic act, it is not controlling in this case. In the cited case the only proof offered by the claimant was the testimony by the manager of the loan company that before the negotiation of the loan the purchaser was unknown to him and that no attempt was made to investigate his moral character. The manager testified that he had never seen the purchaser prior to the time he applied for the loan. The purchaser told him that he lived with his parents and that they had directed him to the finance company for the purpose of refinancing his loan. The manager of the company did not investigate the moral responsibility of the 22-year-old purchaser but merely sought to make sure that the loan was with his parents' consent and to that end he obtained the father's endorsement. Although the boy stated to the manager that he had worked as a musician at various clubs in San Francisco, yet he did not interview any of his former employers because the boy's father endorsed the note. No attempt was made by that loan company to investigate the purchaser's moral character.

Judgment affirmed.

Wood (W. J.), J., and McComb, J., concurred.